LEWIS CHANDLER AND ANOTHER *against* EFFINGHAM B. SUTTON..

Defendant, owner of a house in New York city, received a telegram from his son, asking his lowest price for the house. This telegram was sent at the instigation of the plaintiff, who was a real estate broker. Defendant answered, stating the price he would take, but no sale was made to B., the party whom plaintiff had in view as a purchaser, on account of certain incumbrances on the property.. Eight months afterwards, B., through another broker, purchased the house, the incumbrances having then been removed: *Held*, that the plaintiff was not entitled to a commission as a broker for effecting the sale of the house.

APPEAL by defendant from a judgment of this court entered on the verdict of a jury.

Action to recover broker's commission on the sale of the house and lot 45 East 34th street, in the city of New York, the plaintiff claiming as assignee of the firm of Abner L. Ely.

Defendant denied the employment of plaintiffs' assignors,. as well as the rendering of any services.

Plaintiffs had a verdict for $695 08, and a motion for a new trial was denied.

The facts are fully stated in the opinion.

*Boardman & Boardman*, for appellant.

*Eugene Smith*, for respondents.

ROBINSON, J.—This is one of the various cases growing out of the impudent and persistent claims of brokers in intervening in the sale of real estate of parties who had in no way solicited their interference or encouraged their intermeddling with their affairs, and who seek a recovery, upon mere technical grounds of their agency in the transaction having been in some way recognized, to recover commissions on the transaction. The defendant, owner of a house and lot in this city, being in California in September, 1870, received a telegram from his son in New York, prompted by inquiry by one of the plaintiffs, to name the lowest price he would take for a house he owned in 34th street in this city, and answered it. Such an inquiry necessarily imported that it originated from an adverse party. His offer was not accepted, it being discovered that the property was under lease, and the negotiations ceased. Subsequently, in July, 1871, on the return of the defendant to this city, negotiations between him and the person making such inquiry were renewed through another broker, a Mr. Van Rensselaer, and in consequence thereof he sold the house to the original applicant, a lady, who positively stated that she acquired her knowledge of the property and negotiated for its purchase through other sources than the plaintiffs. The evidence was uncontradicted that defendant acquired his personal knowledge of the purchaser (Mrs. Pond) through other brokers, and not through any agency or interference of the plaintiffs.

No error was committed by the judge on the trial; but the testimony as to the transaction upon which brokerage was claimed so effectually relieved the plaintiff from responsibility and is so overwhelmingly in his favor, that the verdict for the plaintiffs ought not to stand.

Judgment reversed and new trial ordered, with costs to abide the event.

DALY, Chief Justice.—I am disposed to go farther than Judge ROBINSON. In my opinion, the defendant was entitled to a verdict upon the uncontradicted facts in this case. Assuming the plaintiff Burnett's statement to be true, that he first apprised the defendant, through his son, of the fact that Mrs. Pond wished to buy the house, and that the defendant authorized him to sell it for $60,000, agreeing, if he sold it, to pay him the usual commission, Burnett did not sell it, and could not, as there was a lease upon it for five years, and Mrs. Pond would not buy it subject to the lease. Mrs. Pond testified to this expressly, and there is nothing in the case contradicting nor in any way conflicting with her statement. On the contrary, Burnett himself admits that, after the defendant had returned from the West in the fall of 1870, about a month after he (Burnett) had commenced negotiating for the sale of the house, which would be according to his own account, in November, 1870, he called on Stokes, Mrs. Pond's brother-in-law, who told him that she was out of the city, that he had been sick, and that the negotiations had fallen into the hands of Mr. Dodge, and that Dodge would not buy the house with the lease on it. It further appears uncontradicted, that before the defendant's return, on the 28th of September, 1870, his son telegraphed to him in San Francisco, "House declined entirely with lease;" all of which is in accordance with Mrs. Pond's statement that she entirely abandoned the idea of buying the house when apprised of the lease, and that the lady to whom it was leased, and who kept a school there, had an idea of keeping the school for five years.

Burnett never earned any commission, for he did not procure a person who was able and willing to buy upon the terms upon which the defendant was then prepared to sell, which was for $60,000, subject to an existing lease which had five years to run. Upon his first examination in chief, when called as a witness on his own behalf, Burnett says that after his interview with Stokes above mentioned, "the matter rested there, negotiating from time to time and exchanging offers, until they

came to a bargain, and Mrs. Pond purchased the house from the defendant." Whatever he may have intended should have been inferred from this statement, he afterwards admitted that he did nothing thereafter. There was no further negotiating by him; nor offers made to, or by him, nor anything done by him until he learned, more than eight months afterwards, that Mrs. Pond had purchased the house from the defendant, when he promptly stepped in and demanded his commission.

Now, what occurred in the meanwhile, is testified to by four witnesses: Mrs. Pond, her brother-in-law Stokes, the defendant, and his son, and is uncontradicted. The son says that he had one or two interviews with Mr. Stokes, when Stokes being taken sick, he was told that he could see Mr. Dodge, Mr. Stokes' partner, with respect to the matter; that he saw Mr. Dodge; Mr. Dodge wanted the lease removed, and that he told Dodge that he had no authority to remove it, and did not think it could be removed; upon which Dodge, he says, declined the house, and left abruptly; in consequence of which he sent the telegram to his father before referred to, on the 28th of September, 1870. Mrs. Pond had seen the house and examined it in the fall of 1869, before she had ever heard of the broker Burnett, and before he had called upon the defendant's son, or interposed in any way to effect the sale of the house, a fact which he does not presume to deny, and which stands uncontradicted. The house then belonged to a Mr. Brown, and she afterwards learned that the defendant had bought it. Burnett does not testify that she learned it from him, nor does it appear from the testimony how she learned it, except so far as it might be inferred from Burnett's statement that it was he who first informed her brother-in-law Stokes, that the defendant owned the house, which Stokes denied, alleging that he learned it by inquiring at the house, from the lady that occupied it. However this may have been, it is uncontradicted that the negotiation which the defendant set on foot for the sale of the house certainly fell through by reason of an obstacle which could not then be removed, so that as respects Burnett's agency in the matter he accomplished nothing.

The house was sold through the instrumentality of another

broker long afterwards, in the summer of 1871. After the negotiations referred to had come to an end, Mrs. Pond came again to this city, as would seem, in the winter of 1870–1871, and after examining other houses, requested Stokes to make inquiries respecting this one. Stokes sent for another broker, Mr. Van Rensselaer, and through his instrumentality a sale of the house, without the incumbrance of the lease, was effected by Van Rensselaer, in the summer of 1871, for $61,000. Mrs. Pond testified that in resuming negotiations she was influenced by the fact that the lady who had the lease was to leave the house, and because she, Mrs. P., liked it better than any house she had seen. The sale was effected at a greater price, without the incumbrance, a long time afterwards, by another broker; which is, in my opinion, a complete answer to the plaintiff's case. He never procured a purchaser. All, upon his own showing, that he did, was to inform the defendant that Stokes wished to buy the house for Mrs. Pond; but nothing that the defendant or his son did on that information, or that Burnett did, effected any sale. It resulted in ascertaining that there was an obstacle which the defendant could not remove, and the existence of which put an end to all negotiations for a sale. Stokes says that when Mrs. Pond found that there was a lease upon the house she would not touch it at all; so that if the state of things had remained as they were when Burnett, as the broker and agent of the defendant, undertook to sell to Mrs. Pond, no sale could have been effected. That they were changed afterwards, and the obstacle removed, was not owing to anything which Burnett did, or the defendant did, or could do. It was owing to the fact that some eight months afterwards the woman who had the lease, and had kept a school in the house, was to leave it. This entirely changed matters. It led to a new negotiation at Mrs. Pond's instance, and her agent, as he had a right to do, sent for the broker he preferred. He was under no obligation, nor was she, to communicate again with Burnett. He had not been employed either by Stokes or her to negotiate for the purchase of the house. So far as respects the defendant, Burnett came to him or to his son, asking to be employed to sell the property as it then was, for the de-

fendant's price, $60,000, and, being so employed, did not effect the sale. This did not preclude the defendant from employing another broker long afterwards to effect a sale under a different state of facts. The preposterous proposition of Burnett is, that because he was employed to sell the defendant's house, and undertook to sell it to a particular person and could not, that no sale of it could be made to that person thereafter, no matter how changed the facts may have been, without paying him a commission. That he has only to lodge his *caveat* to prevent the owner from selling thereafter to any one to whom he, as broker, tried in vain to sell, unless at the peril of paying to him his full commission. I agree that the judgment should be reversed, and a new trial ordered.

Judgment reversed, and new trial ordered.